# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MARKEL<br>c/o Covington & Burling LLP<br>850 10th Street NW<br>Washington, DC 20001<br><br>                              Plaintiff,<br><br>         v.<br><br>JOHN PHELAN, SECRETARY OF THE<br>NAVY, UNITED STATES OF AMERICA,<br>in his official capacity,<br>1000 Navy Pentagon<br>Washington, DC 20350,<br><br>UNITED STATES DEPARTMENT OF<br>THE NAVY<br>1000 Navy Pentagon<br>Washington, DC 20350, and<br><br>BOARD FOR CORRECTION OF<br>NAVAL RECORDS<br>701 S. Courthouse Road<br>Building 12, Suite 1001<br>Arlington, VA 22204<br><br>                              Defendants. | Civil Action No. 26-cv-97<br><br><br>**COMPLAINT<br>FOR DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.    Plaintiff James Markel ("Plaintiff" or "Mr. Markel"), a veteran of the United States Navy ("Navy" or "the Navy"), brings this action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq* ("APA"), for judicial review of the July 21, 2025 decision by the Board for Correction of Naval Records ("Board") denying his application for permanent medical retirement. The Board has repeatedly, and unlawfully, failed to meaningfully consider Mr. Markel's inability to perform the duties of his office, grade, rank, or rating as a result of a mental health condition that he incurred while entitled to basic pay.

2.      Mr. Markel served as a commissioned Nuclear Surface Warfare Officer in training deployed aboard the USS Forrest Sherman.  Surface Warfare Officers in training such as Mr. Markel are, first and foremost, Unrestricted Line Officers—a community whose defining requirement is the ability to perform duties at sea in order to progress toward eventual command of a surface warship.  For Unrestricted Line Officers assigned to surface warfare training, sea-duty capability is not optional or collateral; it is absolutely essential.  But after nearly two months at sea, Mr. Markel was removed from the USS Forrest Sherman and assigned to Limited Duty precisely because his Major Depressive Disorder rendered him unable to perform any duties of an Unrestricted Line Officer that required him to be at sea.  He was subsequently medically disqualified from providing *any* service at sea.  Under governing law and Naval guidance, Mr. Markel was therefore unfit for duty and entitled to a medical retirement.

3.      Despite the law and Navy manuals unambiguously providing that service members like Mr. Markel who cannot perform the duties of their office, grade, rank, or rating are entitled to medical retirement benefits, the Navy separated Mr. Markel without those benefits in 2009.  Mr. Markel has been fighting to get the benefits he is owed ever since.

4.      Mr. Markel previously challenged two prior Board decisions erroneously denying his request for a correction of his records to reflect a medical retirement.  Earlier this year, in a related case, the Court granted Mr. Markel's motion for judgment on the administrative record on two grounds, agreeing that the Board's 2023 denial of Mr. Markel's request was arbitrary and capricious.  On remand, the Board erred again.  In its July 2025 decision, the Board not only repeated the same rationale the Court had already rejected as arbitrary and capricious, but it also adopted an interpretation of the duties of an Unrestricted Line Officer that contradicts the plain language of the Navy's own personnel manual and the Board's own interpretation of these duties.

5.    Indeed, in its latest decision, the Board reversed its prior position that Unrestricted Line Officers are required to perform duties "both at sea and on shore" and asserted for the first time that an Unrestricted Line Officer's duties do not necessarily include sea-duty capability; instead, the Board argued that this phrase merely means Unrestricted Line Officers may be assigned duties *anywhere*, including exclusively ashore.

6.    The Board's conclusion that Mr. Markel could reasonably perform the duties of an Unrestricted Line Officer while disqualified from sea duty is inconsistent with its own prior determinations of the common military tasks of an Unrestricted Line Officer, inconsistent with the fundamental distinction between Unrestricted and Restricted Line Officers, and inconsistent with the Court's prior opinion.  As the Court previously found, it is illogical and contradictory to state that an Unrestricted Line Officer can reasonably perform his common military tasks when being restricted from service at sea.

7.    Ultimately, the Board again arbitrarily and capriciously concluded that Mr. Markel's performance of limited administrative duties ashore meant that he could perform the tasks of his office, grade, rank, or rating.  But the Board was wrong before, and it is wrong again now.  As before, this Court should vacate the Board's decision.  And given the Board's persistent failure to follow the law and the Court's guidance, this Court should determine that the Board's finding of fitness was arbitrary, capricious, and contrary to law.

## II.    <u>JURISDICTION AND VENUE</u>

8.    Mr. Markel brings this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

3

9.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the United States military and the APA.  10 U.S.C. §§ 1201(b), 1203(b); 5 U.S.C. §§ 701–706.

10.     Mr. Markel seeks exclusively declaratory and other equitable relief.  *See* 5 U.S.C. § 702.  Mr. Markel seeks a declaration that the Board's denial of his application was arbitrary, capricious, unsupported by substantial evidence, and contrary to law, and an order vacating the Board's decision.

11.      The Board's denial of Mr. Markel's application was a final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

12.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) because the Secretary of the Navy is an officer of the United States and because a substantial part of the acts or omissions giving rise to this lawsuit took place in the District of Columbia.  Venue is also proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

13.     In accordance with 28 U.S.C. § 2401, this action is timely, as this Complaint challenges a decision issued by Board within the last six years.

### III.    PARTIES

14.     Plaintiff James Markel is a veteran of the United States Navy who entered the Navy after graduating from the Naval Academy in May 2006.  Mr. Markel was administratively separated and honorably discharged from the United States Navy on March 1, 2009, as a Lieutenant, Junior Grade, at a Pay Grade of O-2.  Mr. Markel is a United States citizen and resides in Glen Rock, Pennsylvania.

15.     Defendant John Phelan is the Secretary of the United States Navy, and is named solely in his official capacity.  He is the chief officer of the United States Navy, and exercises

authority, direction and control over the United States Navy. Defendant Phelan is authorized by 10 U.S.C. § 1552 to correct the military record of any former member of the United States Navy when he considers it necessary to correct an error or remove an injustice. Upon information and belief, Defendant Phelan performs a significant amount of his judicial duties within this district.

16.     Defendant United States Department of the Navy is an agency of the United States government.

17.     Defendant Board for Correction of Naval Records is an agency of the United States Department of the Navy, located in Arlington, Virginia. It is the board of civilians established by the Secretary of the Navy which, pursuant to 10 U.S.C. § 1552, considers applications filed before it for the purposes of determining whether an applicant's Navy military record should be changed to correct an error or injustice.

## IV.    FACTUAL ALLEGATIONS

### A.    Military Disability and Retirement Generally

18.     Title 10, U.S.C., chapter 61, establishes the military's Disability Evaluation System ("DES"), and provides the Secretaries of the Military Departments with authority to retire or separate service members who are unable to perform their military duties because of physical disability resulting from either illness or injury. When a member of the U.S. Armed Forces has one or more disabilities that make the member unfit for continued military service, he is normally separated from service with either (1) medical separation, or (2) medical retirement. This determination turns on the combined disability rating assigned by the military department to the conditions that render the service member unfit for continued service.

19.     If a military department assigns the service member a combined disability rating of 30% or more, the service member is medically retired. A medical retiree is entitled to, among other things, military health care (TRICARE) for the retiree and the retiree's spouse and minor

children, as well as access to military bases, commissary privileges, the right to wear the uniform on appropriate public occasions, space-available travel on military aircraft, disability retirement pay, military funeral arrangements, and burial privileges in national cemeteries.

20.     Importantly, the determination as to whether a service member is unable to perform their duties because of a disability focuses on the duties of that service member's office, grade, rank, or rating.  *See* 10 U.S.C. § 1201 (allowing the Secretaries of the military branches to grant medical retirements when a service member is "unfit to perform the duties of the member's office, grade, rank, or rating").

21.     The term "office" means a "position of duty, trust, authority to which an individual is appointed."  Department of Defense Instruction ("DoDI") 1332.38 § E2.1.21.1.[1]  The term "grade" means step or degree, in a graduated scale of office or military rank, that is established and designated as a grade by law or regulation.  10 U.S.C. § 101(b)(7).  The term "rank" means the order of precedence among members of the armed forces.  10 U.S.C. § 101(b)(8).  The term "rating" reflects an individual service member's occupational field.  10 U.S.C. § 101(b)(9) ("The term 'rating' means the name (such as 'Boatswain's Mate') prescribed for members of an armed force in an occupational field.");  DoDI 1332.38 § E2.1.21.4.[2]  Additionally, the Navy uses "designator" codes to classify, identify, and document occupational field duties and qualifications. *See Manual of Navy Officer Manpower and Personnel Classifications* (Jan. 2010), Vol. I at A-6.

**B.     DES Process**

22.     The DES is initiated by referral and consists of several phases of evaluation and review that result in a final disability determination for a referred individual.  In the Navy, the DES

---

[1] The term "officer" means a commissioned or warrant officer.  *See* 10 U.S.C. § 101(b)(1).

[2] The term "rate" means the name (such as "chief boatswain's name") for members in the same rating or other category who are in the same grade.  10 U.S.C. § 101(b)(9).

process begins when a commanding officer refers a service member for medical evaluation. *See* Secretary of the Navy Instruction ("SECNAVINST") 1850.4E §§ 3102, 3106.[3]

23.    If a wound, illness, or injury results in a permanent condition or has long-lasting effects, a service member is then formally referred to the DES by an attending physician.

24.    After referral, the first formal phase of the DES process involves review by a Medical Evaluation Board ("MEB") of the service member's medical status and duty limitations. *See* DoDI 1332.38 § E3.P1.2.1. The MEB is charged with determining whether any of a service member's mental or physical conditions fail the retention standards set forth by the service member's particular military branch, and the specific reasons why the service member does not meet retention standards. *See* DoDI 1332.38 §§ E4.A1.1.2.11.1–2.

25.    The MEB does not state a conclusion of unfitness due to physical disability, or assign a disability percentage rating, but instead documents a medical opinion that informs the next phase of the DES process to the extent that it proceeds. *See* SECNAVINST 1850.4E § 3104(a).

26.    If the MEB determines that none of the service member's conditions fail the retention standards, the member is returned to full duty. But if the MEB determines that one or more of the service member's medical conditions fail the retention standards, the member is referred to a Physical Evaluation Board ("PEB") within DES. *See* DoDI 1332.38 § E4.A1.1.2.11.4.

27.    The PEB process is responsible for determining a service member's unfitness for duty as a result of disability. DoDI 1332.38 § E3.P1.3.1. The PEB process can include a review

---

[3] SECNAVINST 1850.4E was operative at all times relevant to this Complaint. It governed the Navy DES, and was promulgated under authority granted by 10 U.S.C. § 1216(a)–(b) and DoDI 1332.38.

by an informal board, a formal board, and appellate review, which in the Navy is conducted by the

Naval Council of Review Boards (formerly known as the Naval Council of Personnel Boards) for

service members who have not yet been discharged or separated, and by the Board for service

members who have been separated or retired.  *See* SECNAVINST 1850.4E § 5001.

28.    A service member "shall be considered unfit when the evidence establishes that the

member . . . is unable to reasonably perform the duties of his or her office, grade, rank, or rating

([also] called duties)[.]"  DoDI 1332.38 § E3.P3.2.1; SECNAVINST 1850.4E § 3302(a).  To

determine whether a service member is unable to reasonably perform his duties, the PEB may

consider the following general criteria, including whether the service member (1) has a medical

condition that represents a decided medical risk to his health or to the welfare of other members,

or (2) the medical condition imposes unreasonable requirements on the military to maintain or

protect the member.  DoDI 1332.38 § E3.P3.2.2; *see also* SECNAVINST 1850.4E § 3302(b)(1)–

(2).

29.    Per DoDI 1332.38, determining whether a service member can reasonably perform

his duties includes four relevant considerations, the first of which is whether the service member

can reasonably perform the "common military tasks" of his office, grade, rank, or rating.  DoDI

1332.38 § E3.P3.4.1.1; *see also* SECNAVINST 1850.4E § 3304(a)(1).  These tasks depend on the

occupation of the service member; for example, if a service member is routinely required to fire

his weapon, perform field duty, or wear load bearing equipment/protective gear, the determination

for this particular service member would look at whether he could reasonably perform those tasks.

*Id.*

30.    The three other available considerations to determine whether a service member

can reasonably perform his duties include: whether the service member can take and pass the

required physical fitness test; whether the service member is deployable (if the service member's office, grade, rank, or rating requires deployability); and whether the service member's condition causes loss of qualification for specialized duties. DoDI 1332.38 §§ E3.P.4.1.2–4; *see also* SECNAVINST 1850.4E § 3304(a)(2)–(4).

31.    The PEB's analysis is constrained to whether a service member can reasonably perform the duties as officially assigned prior to referral into the DES process. The regulations do not grant the PEB authority to make a fitness determination based on whether a service member can reasonably perform duties that are *outside* his or her office, grade, rank, or rating.

32.    The PEB process has four possible outcomes. In particular, a service member can be found:

    a.  ***fit for duty***;

    b.  ***unfit for duty, but ineligible for disability benefits*** because, among other reasons, the disability condition was not incurred in the line of duty, existed prior to service, was the result of intentional misconduct or willful neglect, or was incurred during an authorized absence;

    c.  ***unfit for duty and eligible for medical retirement*** with monthly disability retirement pay and other benefits; or

    d.  ***unfit for duty and eligible for medical separation*** with one lump-sum severance payment.[4]

33.    If a service member is found unfit and eligible for either a medical retirement or medical separation, the PEB must assign a percentage disability rating for each unfitting condition, and must use the Veterans Affairs Schedule for Rating Disabilities in doing so. *See* 10 U.S.C. §§ 1201, 1203, National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1642(a), 122 Stat 465, codified at 10 U.S.C. § 1216a.

---

[4] Service members who receive a disability rating of less than 30% are not eligible for medical retirement and may instead be eligible for medical separation. *See, e.g.*, 10 U.S.C. §§ 1201, 1203.

C.    **Mr. Markel's Military History**

34.    Plaintiff James Markel entered the U.S. Naval Academy in Fall 2002.  He had the option to attend the University of Virginia, but after the September 11th attacks, he decided that he wanted to volunteer to defend his country and chose to go to the Naval Academy.

35.    At the Naval Academy, Mr. Markel excelled academically and militarily.  He majored in economics with a minor in German, and graduated in May 2006 with distinction near the top of his class.  Mr. Markel was then commissioned as an Officer in the Navy as an Ensign, and joined with the designator "1160," which is for an Unrestricted Line Officer who is in training for Surface Warfare qualification.[5]  "Unrestricted Line Officers" are "Officers of the line of the Regular Navy and Naval Reserve who are not restricted in the performance of duty."[6]

36.    As part of his selection to become a Nuclear Surface Warfare Officer, Mr. Markel also received a nuclear Additional Qualification Designator, which qualified him for duty involving the supervision, operation, and maintenance of naval nuclear propulsion plants.

37.    After graduating and receiving designator 1160, Mr. Markel continued his studies for one year, studying abroad in Germany.  In August 2007, Mr. Markel returned from his studies

---

[5] *Manual of Navy Officer Manpower and Personnel Classifications* (Jan. 2010), Vol. I at A-7 (1160 is an "Unrestricted Line Officer billet for an officer in training for Surface Warfare qualification."). The Surface Warfare Officer designator can be for conventional ships or nuclear-powered ones. *See* OPNAV Instruction 1420.1B (Dec. 2009), Encl. 1, Ch. 4 § 4.  Once qualified, his or her designation is changed from 116X to 111X.  *See Navy Personnel Manual* ("MILPERSMAN") 1210-090 (Sept. 2006), § 1(b).

[6] The term "Line Officer" refers to "operational service members as opposed to service members from the professional communities or the Chaplain Corps."  *See, e.g.*, *Adair v. England*, 217 F. Supp. 2d 7, 11 n.7 (D.D.C. 2002).  "Unrestricted Line Officers" are "Officers of the line of the Regular Navy and Naval Reserve who are not restricted in the performance of duty."  *Manual of Navy Officer Manpower and Personnel Classifications* (Jan. 2010), Vol. I at A-2.  By contrast, "Restricted Line Officers" are "Officers of the line of the Regular Navy and Naval Reserve who are restricted in the performance of duty by having been designated for aviation duty, engineering duty, aerospace engineering duty, or special duty."  *Id.*

and subsequently reported for duty aboard the USS Forrest Sherman (an *Arleigh Burke*-class guided missile destroyer) in order to begin to qualify as a Surface Warfare Officer.

38.     On board the USS Forrest Sherman, Mr. Markel initially served as an Assistant Communications Officer.  His duties included actively managing personnel and obtaining highly technical qualifications, and he helped oversee and manage 13 Information System Technicians that were responsible for administering and maintaining the ship's radio and computer equipment, including satellite communications and cryptographic equipment.  In addition to these supervisory responsibilities, Mr. Markel was also required to stand five-hour watches, requiring alertness, every ten hours.

39.     In November 2007, while serving on the USS Forrest Sherman on deployment, Mr. Markel experienced anxiety, difficulty breathing, rapid heartbeat, restlessness, inability to sleep, trouble focusing, and feelings of frustration and agitation.  At times, he also had thoughts of self-harm and/or harming others.  Mr. Markel's symptoms eventually became so intense that his commanding officer ordered Mr. Markel to be medically evacuated off the USS Forrest Sherman to a U.S. Naval hospital in Rota, Spain for evaluation and inpatient treatment.

40.     At the hospital, Mr. Markel was prescribed medication and diagnosed with Bipolar Disorder.  During this time, Mr. Markel reported auditory hallucinations.  After being evaluated in Spain for ten days, Mr. Markel was discharged to the Naval Medical Center in Portsmouth, Virginia for further treatment and care.  At the same time, Mr. Markel was reassigned from his shipboard duties to working in an administrative role under the Commander of the Naval Surface Force for the U.S. Atlantic Fleet ("SURFLANT") in December 2007.

41.     Also at this time, while at Portsmouth, Mr. Markel's doctors determined that he was not "psychiatrically fit for full duty" and therefore was placed on Limited Duty and referred

11

to an MEB for evaluation.  During this time, his tasks were, definitionally, limited.  Mr. Markel's office, grade, rank, and rating did not change.

42.    While on Limited Duty at SURFLANT, Mr. Markel performed administrative tasks, such as data entry and compiling reports, which did not require any technical skills.  Mr. Markel was free to attend therapy and medical appointments during the workday and worked limited hours.  Mr. Markel also took prescribed medications during this time that limited his ability to perform complicated tasks.  Mr. Markel's assigned tasks at SURFLANT were in stark contrast to those he performed while serving aboard the USS Forrest Sherman as an Unrestricted Line Officer in training for Surface Warfare qualification.

43.    On January 31, 2008, the MEB changed Mr. Markel's diagnosis from Bipolar Disorder to Major Depressive Disorder, Recurrent, with Psychotic Features.  The MEB also determined that Mr. Markel suffered "from a condition that did not exist prior to entry into the service," and that he had "received the maximum benefit of military medical treatment [which] has not restored the patient to a duty status."  Accordingly, the MEB referred Mr. Markel's case to a PEB.

44.    On March 10, 2008, while on Limited Duty and still experiencing symptoms, the PEB found that Mr. Markel was fit to continue active duty.  The PEB's written decision did not explain the basis for its finding.

45.    Despite the PEB's fitness finding, in June 2008, the Navy's Bureau of Medicine and Surgery ("BUMED") medically disqualified Mr. Markel from Submarine and Nuclear Field Duty because of "a history of Bipolar and Anxiety Disorder; Recurrent Depression, current Psychotropic [medication] use[.]"

46.    In July 2008, Mr. Markel was also found to be "assignment limited" (meaning he could not be deployed worldwide without limitations) and found not suitable to return to sea duty because of his current mental state.  In other words, the Navy determined that Mr. Markel was restricted on what he could and could not do.

47.    Despite his disqualification from sea duty, Mr. Markel wanted to continue to contribute to the Navy, so he sought a redesignation as a Human Resources Officer, which is a Restricted Line Officer.[7]  Recognizing Mr. Markel's talents in a non-shipboard environment, SURFLANT Commander Captain Berdar wrote a letter in support, "strongly recommend[ing]" Mr. Markel for redesignation, noting that Mr. Markel "strongly desires to continue his naval service as a Human Resources Officer."  Captain Berdar described Mr. Markel as an "exceptional junior officer" and an "indispensable asset" who possessed "uncanny organizational, leadership, and deductive reasoning skills."

48.    Captain Berdar's views of Mr. Markel, expressed in his recommendation letter and Mr. Markel's fitness report, were clearly based on Mr. Markel's performance of administrative tasks while shorebound on Limited Duty at SURFLANT, *not* on Mr. Markel's abilities to reasonably perform the duties of an Unrestricted Line Officer.  Specifically, Captain Berdar stated that Mr. Markel completed tasks such as "compiling of over 1000 impact reports and the maintaining and updating of 3 separate databases."  These are not the primary tasks expected of Mr. Markel's office, grade, rank, or rating, nor consistent with his previous duties while serving aboard the USS Forrest Sherman.  Nor did Captain Berdar ever suggest that Mr. Markel could

---

[7]  *See* NAVPERS 15839I (Vol. 1) "Restricted Line (Human Resources)"; *see also* COMNAVSURFORINST 1412.lC, 12XX as "Special Duty Officer (Human Resources)."

continue serving as an Unrestricted Line Officer, as that suggestion would be inconsistent with the deployability and sea-duty restrictions required of Mr. Markel.

49.     Despite Captain Berdar's enthusiastic recommendation for Mr. Markel's redesignation as a Human Resources Officer, the request for redesignation was denied in November 2008, belying any notion that reassignment was feasible.

50.     Denied redesignation and still unable to engage in sea duty or worldwide deployability as a result of his mental health condition, Mr. Markel was given no other option to continue service.  Despite his efforts to remain an officer and fulfill his commitment to the Navy, on March 1, 2009, approximately 18 months after being assigned to the USS Forrest Sherman, Mr. Markel was administratively separated and honorably discharged from the Navy without a medical retirement, as a Lieutenant, Junior Grade, at a Pay Grade of O-2.  At no point, as confirmed by his military personnel records, did Mr. Markel ever request to be discharged or separated, and he did everything in his power to remain in the Navy in some capacity to fulfill his dream of a naval career.

51.     As of the date of his discharge, Mr. Markel received a 50% disability rating for his Major Depressive Disorder from the VA.[8]  The VA also determined that his disability was service-connected, or in other words, that his condition was "incurred during or aggravated by military service."

---

[8] The VA initially rated Mr. Markel's disability at 30%, but Mr. Markel appealed and as a result, the VA changed its rating to 50%, effective March 1, 2009, the date of Mr. Markel's discharge. At no point was Mr. Markel's disability ever rated at less than 30%.  The VA subsequently rated Mr. Markel's disability at 100%, effective January 28, 2015.

52.     Other than Mr. Markel's promotion to Lieutenant, Junior Grade, at a Pay Grade of O-2, his office, grade, rank, or rating did not change from the date he reported to the USS Forrest Sherman for duty to the date of his separation.

### D.     Mr. Markel's Post-Military Life

53.     After his discharge, Mr. Markel tried his best to overcome the challenges of his disability and continue to provide for his wife and family.  In 2011, despite continuing to struggle with his symptoms, he received a Master's degree in Foreign Service from a part-time program at Georgetown University, and he also took architecture classes at Virginia Tech.

54.     But Mr. Markel's discharge exacerbated his symptoms, and his condition ultimately made it difficult for Mr. Markel to gain and keep employment.  In the years since his discharge, Mr. Markel struggled greatly, experiencing deep bouts of depression and anxiety, and long periods of unemployment.  He has been hospitalized multiple times, including times when Mr. Markel sought treatment because of persistent suicidal thoughts.

### E.     Mr. Markel's Application for Correction of His Naval Record

55.     In August 2015, Mr. Markel filed an application with the Board to obtain a medical retirement.  As Mr. Markel indicated in his application, the PEB's finding of "fit" was erroneous: at around the same time the PEB found him fit, BUMED found that he was medically disqualified from his field, that he could not be deployed, and was significantly restricted in the duties he could perform given that he was disqualified from service at sea.

56.     On May 20, 2016, the Board denied Mr. Markel's application.  Explaining its decision in a short two-page letter, the Board appeared to rely solely on Captain Berdar's positive evaluation of Mr. Markel—which was insufficient to even support his re-designation as a Human Resources Officer—to conclude that Mr. Markel was "performing exceptionally well despite the existence of [his] condition" and that there was no "evidence of an occupational impairment."

*Cf. Kelly v. United States*, 69 F.4th 887, 895 (Fed. Cir. 2023) (agreeing that Board's sole reliance on plaintiff's final two performance evaluations in which plaintiff was performing a different role "produced a deficient and erroneous result").

### F.   First Lawsuit Challenging the Denial of Mr. Markel's Application to Correct his Naval Record and the Court's Ruling

57.     In May 2022, Mr. Markel filed a related lawsuit challenging the Board's erroneous 2016 decision. *See* Compl., *Markel v. Del Toro, et al.*, No. 22-1389, ECF No. 1 (D.D.C. May 19, 2022).   Rather than defend the Board's denial of Mr. Markel's application, Defendants agreed to a voluntary remand back to the Board so that the Board could reconsider Mr. Markel's application. The Court then remanded Mr. Markel's case, instructing the Board to issue a new final decision explaining Mr. Markel's entitlement to medical retirement pursuant to 10 U.S.C. § 1201, DoDI 1332.38, and other statutory and regulatory guidance.

58.     On remand, Mr. Markel submitted a brief and exhibits in support of his application, explaining that he could not reasonably perform the duties of his office, grade, rank, or rating because of his Major Depressive Disorder, and was therefore entitled to a permanent medical retirement.   In support of his application, Mr. Markel submitted medical and other military records demonstrating that he could not complete the majority of his common military tasks because of his condition, that he could not deploy because of his condition or serve at sea, and that he lost his nuclear qualification because of his condition.

59.     On March 28, 2023, the Board again denied Mr. Markel's application ("2023 Remand Decision").[9]   But the 2023 Remand Decision suffered from the same fundamental flaw as the first decision: rather than actually analyze whether Mr. Markel could reasonably perform

---

[9] The Board's 2023 Remand Decision is attached to this Complaint as Exhibit A.

the duties of the office, grade, rank, or rating of an Unrestricted Line Officer, the Board simply determined that the PEB's original fitness finding was correct because Mr. Markel performed administrative tasks well while on Limited Duty at SURFLANT.

60.    As the 2023 Remand Decision admitted, the "common military tasks" of Unrestricted Line Officers (like Mr. Markel), unlike Restricted Line Officers, "include[] training and leading Sailors; learning and becoming proficient in the wide variety of technical tasks associated *with service onboard service ships*; thinking; planning; organizing; coordinating; and performing administrative functions." Ex. A at 7 (emphasis added). Nearly all of these "common military tasks" are performed on board a warship or aircraft at sea, which is not the case for Restricted Line Officers.[10]

61.    As their titles suggest, Restricted and Unrestricted Line Officers have inherently different duties—the latter are unrestricted in their eligibility for command of a warship or aviation squadron at sea, while the former are restricted in that pursuit. Put simply, Unrestricted Line Officers are eligible to command at sea—Restricted Line Officers are not. Although Unrestricted Line Officers may perform some administrative and technical tasks, typically related to or in furtherance of sea service, those tasks are not their primary duty.[11]

---

[10] *See Students for Fair Admissions v. United States Naval Acad.*, 758 F. Supp. 3d 423, 447 n.20 (D. Md. 2024), *opinion vacated on other grounds, appeal dismissed sub nom. Students for Fair Admissions, Inc. v. United States Naval Acad.*, No. 24-2214, 2025 WL 1859393 (4th Cir. July 2, 2025) ("The unrestricted line is 'the category of communities within the United States Navy that broadly encompass . . . warfare specialties,' such as surface warfare, aviation, submarines, and special forces. Unrestricted line officers are eligible to command the Navy's ships, submarines, aircraft squadrons, fleets, and shore bases, while restricted line officers are not." (internal citation omitted))

[11] *See Manual of Navy Officer Manpower and Personnel Classifications* (Jan. 2010), Vol. I at A-6–7; United States Navy Restricted Line Officer Community Managers, https://www.mynavyhr.navy.mil/Career-Management/Community-Management/Officer/Active-OCM/Restricted-Line/.

62.    On June 9, 2023, Mr. Markel filed an amended complaint asserting the 2023 Remand Decision violated the APA.

63.    On January 27, 2025, following cross-motions for summary judgment, the Court agreed with Mr. Markel that the 2023 Remand Decision was arbitrary and capricious on two grounds: (1) the Board's "determination that [Mr. Markel] could perform an Unrestricted Line Officer's common military tasks" was "self-contradictory," "illogical," and "not rationally connected to the facts," and (2) the Board "failed to adequately grapple with evidence of [Mr. Markel]'s inability to perform his common military tasks associated with service at sea," and therefore, the Board's decision was "not supported by substantial evidence." *Markel v. Del Toro*, No. 22-1389 (RJL), 2025 WL 304875, at *5–6 (D.D.C. Jan. 27, 2025).

64.    Within its analysis, the Court upheld the Board's description of the common military tasks that should be considered when determining whether Mr. Markel could have reasonably performed his duties: "According to the [Board], the common military tasks associated with being an Unrestricted Line Officer are: training and leading Sailors; learning and becoming proficient in the wide variety of technical tasks associated with service onboard service ships; thinking; planning; organizing; coordinating; and performing administrative functions." *Id.* at *4.

65.    This Court remanded Mr. Markel's case for further proceedings "consistent with [its] Opinion" and dismissed the case. *See Markel v. Del Toro*, No. 22-1389, ECF No. 32 (D.D.C. Jan. 27, 2025).

### G.    Second Board Decision on Remand

66.    On July 21, 2025, the Board again issued a decision rejecting Mr. Markel's application to correct his naval record ("2025 Remand Decision").[12] Like its predecessor decision,

---

[12] The Board's 2025 Remand Decision is attached to this Complaint as Exhibit B.

the 2025 decision was permeated with error.  Although the Board stated it conducted a *de novo* review of Mr. Markel's case and "afford[ed] no deference to the previous decisions in [Mr. Markel's] case, "[t]he Board concurred with the conclusions as expressed in the [2023 Remand Decision] and adopted and incorporated the content of that letter by reference," even after the Court had ruled that elements of that decision were arbitrary and capricious.  Ex. B, 2025 Remand Decision at 2.

67.    The Board's foundational error was its refusal to apply its own previously articulated definition of the "common military tasks" of an Unrestricted Line Officer.  In earlier proceedings, the Board identified those tasks as including "training and leading Sailors" and "becoming proficient in the wide variety of technical tasks associated with service onboard surface ships," in addition to planning, coordinating, and administrative functions.  Ex. A, 2023 Remand Decision at 7; *see also Markel*, 2025 WL 304875, at *4.  Instead, in the 2025 Remand Decision, the Board stated, *for the first time*, that "the duties/common military tasks associated with [Mr. Markel's] rating *did not necessarily entail future service aboard surface ships at sea*," and indeed were "*whatever (and wherever) the Navy determines them to be*."  Ex. B, 2025 Remand Decision at 2–3 (emphasis added).  This redefinition, unsupported by a single cite to Naval regulation or guidance, allowed the Board to disregard the sea-duty component that previously anchored its analysis.

68.    Under the Board's logic, Mr. Markel's duties were untethered from any established Naval regulation or guidance for an Unrestricted Line Officer, and instead were "whatever (and wherever)" the Navy chose. The Board acknowledged that its broad and undefined approach "would make it difficult for any [Unrestricted Line] officer without a designation, like [Mr. Markel], to be found unfit since the duties for such an officer could be crafted to the individual

officer's physical capabilities." *See id.* at 3 n.8. In other words, the Board recognized that it had redefined Unrestricted Line Officer duties so broadly that a finding of medical unfitness under 10 U.S.C. § 1201 would be difficult, if not potentially impossible, to achieve, by essentially removing meaningful consideration of the duties Mr. Markel was expected to perform at the onset of his disability.

69.     The 2025 Remand Decision goes on to state that "[t]he circumstances under which [Mr. Markel] came to be performing administrative duties at SURFLANT are irrelevant, as those were in fact duties that an [Unrestricted Line] officer could reasonably expect to perform." Ex B. at 3. That reasoning is fundamentally flawed. The statutory and regulatory fitness inquiry asks whether the service member can perform the duties of his office, grade, rank, or rating, not whether he can perform some task the Navy temporarily assigns. And the Board's own prior definition made clear that administrative tasks were only one element of the Unrestricted Line Officer's duties—the core duties involve leadership and technical proficiency associated with service aboard surface ships at sea. Mr. Markel's assignment to SURFLANT occurred precisely because his Major Depressive Disorder rendered him medically ineligible for sea duty—the defining requirement of an Unrestricted Line Officer. That assignment therefore demonstrates unfitness for Unrestricted Line Officer duties.

70.     Rather than grapple with the fact that Mr. Markel was unable to perform the majority of tasks the Board had previously identified as the common military tasks of an Unrestricted Line Officer, or address the errors identified by the Court, the Board arbitrarily and capriciously changed its prior definition of Mr. Markel's common military tasks to be "whatever (and wherever) the Navy determines them to be" and deemed the circumstances which caused Mr. Markel to no longer be able to serve at sea "irrelevant." *Id.* at 3. Further, according to the Board,

the Navy would have assigned Mr. Markel new duties and tasks that he could have performed but he "voluntarily resigned," *id.* at 3 & nn. 9–10, relying on this purported resignation to justify its decision despite there being no evidence in the record to support the claim that Mr. Markel voluntarily resigned.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the APA, 5 U.S.C. § 706(2)(A) –**
**Arbitrary, Capricious, and Otherwise Not in Accordance With Law)**

71.    Plaintiff realleges and incorporates here Paragraphs 1 through 70.

72.    The Board's 2025 Remand Decision constitutes final agency action under the APA. Mr. Markel's unsuccessful application to the Board was the last available administrative remedy for review of his separation from the Navy.

73.    The Board's denial of Mr. Markel's application is arbitrary, capricious, and otherwise not in accordance with law because the Board contradicted its prior definition of the duties of an Unrestricted Line Officer when it denied Mr. Markel's application.

74.    The Board previously defined the duties and common military tasks of an Unrestricted Line Officer as including: "training and leading Sailors; learning and becoming proficient in the wide variety of technical tasks associated with service onboard service ships; thinking; planning; organizing; coordinating; and performing administrative functions – the same common military tasks expected of all newly-commissioned Unrestricted Line (URL) officers." Ex. A, 2023 Remand Decision at 7. The Board's identification of the applicable common military tasks for an Unrestricted Line Officer—and the undisputed fact that Mr. Markel could not complete them—was central to the Court's ruling that the Board's 2023 Remand Decision was arbitrary and capricious. *Markel*, 2025 WL 304875, at *5 ("The BCNR included as common military tasks 'the

wide variety of technical tasks *associated with service onboard service ships*' and explained that Unrestricted Line Officers 'are assigned to perform a wide variety of tasks, *both at sea and on shore*.' [Mr. Markel]'s condition prevented him from returning to service at sea, as the BCNR acknowledged.") (emphases added in Court's opinion) (internal citation omitted).

75.     Rather than issue a new decision consistent with these prior findings, the Board simply—and arbitrarily—abandoned its previous definition and redefined Unrestricted Line Officer duties to "not necessarily entail future service aboard surface ships at sea." Ex. B, 2025 Remand Decision at 2. This *post hoc* rationalization of the duties of Unrestricted Line Officers is inherently arbitrary and capricious. It is also flatly inconsistent with the Board's prior decision (which was incorporated by reference into the 2025 Remand Decision) that clearly acknowledged that Unrestricted Line Officers are expected to have the ability to perform at sea. Moreover, it contradicts longstanding Navy guidance that treats Unrestricted Line billets as inherently sea-going.[13]

76.     The Board's 2025 Remand Decision is also arbitrary, capricious, and otherwise not in accordance with law because the Board reinterpreted an Unrestricted Line Officer's duties so broadly, including "potential duties."

77.     By concluding that "the potential duties of a URL officer (without a specialty designation) are broad and undefined – they are whatever (and wherever) the Navy determines them to be[,]" Ex. B, 2025 Remand Decision at 3, the Navy unlawfully adopted a standard untethered to statute, regulation, or guidance. This interpretation would impermissibly allow the

---

[13] *See supra nn.* 5–6; *see also* Ex. A at 7 ("URL officers are, by design and naval tradition, generalists. They are assigned to perform a wide variety of tasks, both at sea and on shore.").

Navy to retroactively tailor duties to a member's impairments, circumventing the DES process for determining fitness.

78. As a direct result of Defendants' actions, Mr. Markel has been, and continues to be, deprived of the benefits of the disability retirement to which he is entitled.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Violation of the APA, 5 U.S.C. § 706(2)(A), (E) –
Arbitrary, Capricious, and Otherwise Not in Accordance With Law and Unsupported by
Substantial Evidence)**

79. Plaintiff realleges and incorporates here Paragraphs 1 through 78.

80. In reaching its 2025 Remand Decision, the Board relied on Mr. Markel's purported voluntary resignation from the Navy as fact, despite the complete absence of any evidence or basis for that finding in the record. *See* Ex. B at 3. Agency action that relies on purported facts without any basis in the record supporting those facts, and which relies on facts unsupported by substantial evidence, must be set aside.

81. As a direct result of Defendants' actions, Mr. Markel has been, and continues to be, deprived of the benefits of the disability retirement to which he is entitled.

**VI.    REQUEST FOR RELIEF**

82. WHEREFORE, Plaintiff James Markel respectfully requests that the Court provide the following relief:

    a.  Find that the Board's Remand Decision, including the Board's finding of fitness, was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence;

    b.  Declare that the Board has violated the Administrative Procedure Act;

    c.  Vacate the Board's 2025 Remand Decision;

    d.   Award Plaintiff interests, costs, and attorneys' fees; and

    e.   Grant such other and further relief this Court deems just and appropriate.


Respectfully submitted this 14th day of January, 2026

*/s/ Jeffrey Huberman*

| | |
|---|---|
| Jeffrey Huberman (DC Bar No. 1531182) | Esther Leibfarth (DC Bar No. 1016515) |
| COVINGTON & BURLING LLP | Rochelle Bobroff (DC Bar No. 420892) |
| 850 10th Street NW | National Veterans Legal Services Program |
| Washington, DC 20001-4956 | 1600 K Street, NW, Suite 500 |
| Phone: (202) 662-5166 | Washington, DC 20006-2833 |
| jhuberman@cov.com | Phone: (202) 265-8305, ext. 130 |
| | esther@nvlsp.org |
| | rochelle@nvlsp.org |

*Counsel for Plaintiff*